# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ROME DIVISION

| | |
|---|---|
| TOM PALMER, derivatively on behalf of MOHAWK INDUSTRIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> JEFFREY S. LORBERBAUM, FRANK H. BOYKIN, GLENN R. LANDAU, WILLIAM CHRISTOPHER WELLBORN, FILIP BALCAEN, KAREN A. SMITH BOGART, BRUCE C. BRUCKMANN, RICHARD C. ILL, JOSEPH A. ONORATO, WILLIAM H. RUNGE III <br><br> Defendants, <br><br> and <br><br> MOHAWK INDUSTRIES, INC., <br><br> Nominal Defendant. | Civil Action No.: ___4:20-cv-110-MHC___ <br><br><br><br><br><br> **JURY TRIAL DEMANDED** |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Tom Palmer ("Plaintiff"), by and through his undersigned attorneys,

hereby brings this Verified Stockholder Derivative Complaint (the "Complaint") for

the benefit of nominal defendant Mohawk Industries, Inc. ("Mohawk" or the "Company") against the Individual Defendants (defined herein) seeking to remedy their breaches of fiduciary duties from April 28, 2017 through July 25, 2019 (the "Relevant Period").  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief based on the investigation of undersigned counsel, which included, without limitation: (a) review and analysis of public filings made by Mohawk with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Mohawk; (c) review of news articles, stockholder communications, and postings on Mohawk's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with and publicly available in a related securities fraud class action currently pending in this Court captioned, *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc. et al*., No. 4:20-cv-00005-ELR (the "Securities Class Action"); and (e) review of other publicly available information concerning Mohawk and the Individual Defendants.

# **INTRODUCTION**

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty against certain officers and members of Mohawk's Board of Directors (the "Board").

2.      Mohawk was founded in 1988 and is headquartered in Calhoun, Georgia.  Mohawk is a global manufacturer of flooring products.  Mohawk designs, manufactures, sources, distributes, and markets flooring products for remodeling and new construction of residential and commercial spaces in the United States and internationally.  The Company conducts its business through three segments: Global Ceramic, Flooring North America ("Flooring NA"), and Flooring Rest of World ("Flooring ROW"). The Global Ceramic segment offers a range of ceramic and porcelain tile and natural stone products.  The Flooring NA segment offers floor covering product lines, including carpets, rugs, laminate, hardwood flooring, sheet vinyl, and luxury vinyl tile in North America.  The Flooring ROW segment offers laminate, sheet vinyl, carpet, hardwood flooring, and luxury vinyl tile internationally.

3.      The Company's traditional product offerings include ceramic, stone, laminate, carpet, wood, and vinyl flooring (the "Conventional Flooring Products").  The Company sells its products through independent distributors, home centers,

company-operated service centers and stores, floor covering retailers, ceramic specialists, commercial contractors, commercial end users, mass merchandisers, department stores, e-commerce retailers, shop at home, buying groups, retailers, and wholesalers, as well as private labeling programs.

4.     Over the past several years, Luxury Vinyl Tile ("LVT") has been the hot commodity in flooring materials as an alternative to more traditional floor coverings.  LVT offers the richness and texture of more expensive natural materials, such as hardwood, ceramic tile, and stone, without the cost.  LVT is predominantly manufactured in and exported from China, where manufacturers swiftly ramped up LVT production capacity and led the pace on LVT product innovation.

5.     During the Relevant Period, the Company described the rapid growth in U.S. consumer demand for LVT as the biggest change in the flooring industry since carpet in the 1960s.  To illustrate, in just five years, LVT has gone from rarely being used to comprising approximately 15% of all flooring sales in the U.S.  However, as the popularity and consumer demand for LVT grew, consumer demand for the Company's Conventional Flooring Products diminished.  This was troubling for the Company as this was the segment that Mohawk had traditionally dominated and brought in higher margins.

6.      While Mohawk's competitors entered into direct distribution deals with Chinese manufacturers in response to the growing LVT market, Mohawk decided to invest in LVT production plants and grow its LVT business through the acquisition of IVC Group ("IVC"), an LVT manufacturer with operations in Europe and the U.S., in a deal worth $1.2 billion that closed on June 15, 2015.

7.      This decision proved fateful as Mohawk struggled to grow its LVT business and keep up with consumer demand for LVT products, because the Company experienced LVT "capacity restraints" and other production issues. Moreover, rapid growth in demand for LVT destroyed sales of Mohawk's Conventional Flooring Products, which the Company has historically relied upon.

8.      In an effort to hide these deficiencies, the Individual Defendants caused the Company to engage in a "channel stuffing" scheme for its Conventional Flooring Products.  Channel stuffing is a business practice in which a company, or a sales force within a company, inflates its sales figures by forcing more products through a distribution channel than the channel is capable of selling.  Here, the Individual Defendants caused Mohawk to induce their distributors to take on surpluses of Conventional Flooring Products that were vastly greater than demand, in an effort to make Mohawk's sales growth and financial performance appear far better than they were.

9.     Two important metrics investors considered in assessing the Company's financial performance were: (1) Days Sales Outstanding ("DSO") and (2) Days in Inventory (or Inventory Days) ("DII").  Mohawk recognizes revenue once its customers receive its products.  If the Company did not collect cash at the time of sale, the amount owed is also reflected on the Company's balance sheet as accounts receivable.  DSO represents the average number of days that it takes Mohawk to collect payment after a sale has been made.  This metric is significant because a high DSO indicates that Mohawk is taking longer to collect money from its accounts receivable and generate cash flow and could signal that its customers already have a high volume of inventory that they are not quickly selling through to end users.  DII is a ratio that measures the average number of days that Mohawk holds its inventory before selling it to its customers.  This metric is significant because a high DII indicates that Mohawk has been manufacturing quantities of products that its customers have been unwilling or unable to purchase.  A similar ratio related to DII is "inventory turnover," which refers to the number of times Mohawk is able to sell its inventory over a particular time period.  In general, a higher inventory turnover ratio is preferred because it indicates a greater generation of sales for Mohawk.

10.    On April 28, 2017, the start of the Relevant Period, Mohawk held a conference call with analysts and investors to discuss the Company's financial

results for the first quarter of 2017.  During the call, defendant Jeffrey S. Lorberbaum

("Lorberbaum") touted the "growing demand" for certain of Mohawk's Conventional

Flooring Products and that the Company's investments in making "more

differentiated products" and "innovative new products" were a driving factor in

Mohawk's sales growth.  During the call, defendant Frank Boykin ("Boykin") told

investors that the Company's DSO had increased to 54.9 days compared to 52.3 days

the prior year, purportedly as a result of "channel mix."  Defendant Boykin also

reported increased inventories, with DII increasing to 110 days compared to 107 days

the prior year, and attributed the increase to "geographic expansion and product

growth."

11.     Throughout the Relevant Period, the Individual Defendants continued

to cause the Company to make false and misleading statements about the Company's

sales growth and demand for its Conventional Flooring Products.  Despite the

Company's accounts receivable and inventory levels increasing during the Relevant

Period, the Individual Defendants kept investors and the public in the dark by issuing

misleading statements that represented that those increases were the result of external

factors like rising raw material costs and inflation.  In reality, however, Mohawk was

engaging in a channel stuffing scheme to artificially inflate its sales and revenues,

and the Individual Defendants failed to disclose that Mohawk was stuffing its

distribution channels with Conventional Flooring Products, which made the Company's sales growth and financial performance appear far better than they actually were.

12.     On July 25, 2018, after the market closed, the Company reported disappointing financial results for the second quarter of 2018, with earnings that were well below both Wall Street estimates and the Company's previous guidance range.  The following morning, in a conference call with analysts and investors, Mohawk also disclosed deteriorating margins which it attributed, in part, to significant production cuts the Company imposed to normalize inventory. Specifically, the Company revealed that it "produced less [Conventional Flooring Products] than [it] sold to reduce inventory."  Similarly, Mohawk also revealed that it "reduced [its] production volumes more than [the Company] had thought" and that the Company "came into the year with higher inventories than [it] wanted to have." These disclosures caused the Company's stock price to decline from $217.37 per share to $179.31 per share, or over 17%.

13.     Then, on October 25, 2018, after the market closed, the Company reported sales and earnings for the third quarter of 2018 that substantially missed analysts' estimates and the Company's previous guidance range, with sales growth in all segments lower than estimates.  Company executives attributed Mohawk's

poor financial results, in part, to further manufacturing reductions that were required during the period to control inventory buildup.  On this news, the Company's stock price fell nearly 24%, from $151.07 per share to $115.03 per share.

14.     On July 25, 2019, after the market closed, Mohawk reported that sales in its Flooring NA segment were down 7% and revealed that the Company was again reducing production to control inventory levels and match its supply with customer demand.   The Company also revealed that increased competition and excess inventory had impacted its financial results, particularly in its Global Ceramic segment.  The Company announced that "lower demand" for certain Conventional Flooring Products created excess inventory which impacted the Company's sales and margins.  The Company further revealed that there was a "big buildup in inventory in ceramic" in the sales channel, which had negatively impacted the Company's sales.  Accordingly, the Company provided a weak earnings forecast for the third quarter of 2019, which was well below analysts' estimates.  As a result of these disclosures, the price of Mohawk's stock dropped from $156.36 per share to $128.84 per share, or nearly 18%.

15.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Mohawk has sustained damages as described below.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that complete diversity exists between Plaintiff and each of the defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

17.    This Court has personal jurisdiction over each of the defendants because each defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this District under 28 U.S.C. § 1391(a) because the Company maintains is principal executive offices in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

## PARTIES

19.    Plaintiff has continuously been a Mohawk stockholder since 2014. Plaintiff is a citizen of Minnesota.

20.     Defendant Mohawk is a global manufacturer of flooring products. Mohawk markets and distributes its products under various brands which it sells through independent distributors, home centers, retailers, and wholesalers. Incorporated in Delaware, the Company maintains its corporate headquarters at 160 South Industrial Blvd., Calhoun, Georgia.  The Company's common stock trades on the New York Stock Exchange under ticker symbol "MHK."

21.     Defendant Lorberbaum has served as a director of the Company since its acquisition of Aladdin Mills Inc. ("Aladdin") in March 1994.  He has served as Chairman of the Board since May 2004 and as the Company's Chief Executive Officer ("CEO") since January 2001.   From January 1995 until January 2001, Lorberbaum served as  Mohawk's President and Chief Operating Officer ("COO"). Lorberbaum joined Aladdin in 1976 and served as Vice President – Operations from 1986 until February 1994 when he became President and CEO.  Upon information and belief, defendant Lorberbaum is a citizen of Tennessee.

22.     Defendant Boykin was named Chief Financial Officer ("CFO") of the Company in April 2020.  He previously served as CFO and Vice President – Finance from January 2005 until April 2019, Vice-President, Corporate Controller of the Company from May 1999 to January 2005 and as Corporate Controller of the

Company from April 1993 until May 1999.  Upon information and belief, defendant Boykin is a citizen of Georgia.

23.    Defendant William Christopher Wellborn ("Wellborn") has served as a director of the Company since its acquisition of Dal-Tile International Inc. ("Dal-Tile") in March 2002.  He has served as the Company's COO since November 2005 and as its President and COO since November 2009.  Defendant Wellborn was Executive Vice President, CFO, and Assistant Secretary of Dal-Tile from August 1997 through March 2002.  From March 2002 to November 2005, he served as President – Dal-Tile.  Upon information and belief, defendant Wellborn is a citizen of Georgia.

24.    Defendant Glenn R. Landau ("Landau") served as Mohawk's Executive Vice President and CFO from April 2019 to April 2020.  Upon information and belief, defendant Landau is a citizen of Georgia.

25.    Defendant Filip Balcaen ("Balcaen") has served as a director of Mohawk Industries since 2015.  Upon information and belief, defendant Balcaen is a citizen of Belgium.

26.    Defendant Karen A. Smith Bogart ("Bogart") has served as a director of the Company since 2011.  Upon information and belief, defendant Bogart is a citizen of California.

27.     Defendant Bruce C. Bruckmann ("Bruckmann") has served as a director of the Company since October 1992. Upon information and belief, defendant Bruckmann is a citizen of New York.

28.     Defendant Richard C. Ill ("Ill") has served as a director of the Company since May 2011.  Upon information and belief, defendant Ill is a citizen of the Commonwealth of Pennsylvania.

29.     Defendant Joseph A. Onorato ("Onorato") has been a director of the Company since February 2008. Upon information and belief, Defendant Onorato is a citizen of Connecticut.

30.     Defendant William H. Runge III ("Runge") has been a director of the Company since July 2014.  Upon information and belief, defendant Runge is a citizen of Georgia.

31.     Defendants Lorberbaum, Boykin, Wellborn, Landau, Balcaen, Bogart, Bruckmann, Ill, Onorato, and Runge are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

32.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the

fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

33.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Mohawk were required to, among other things:

a.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

14

b.      conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.      remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.      ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

35.    Each Individual Defendant, as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, and candor

in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a conscious disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.    The Company has adopted a Standards of Code and Business Ethics (the "Code") that applies to all employees, including officers and members of the Board.  The Code states:

**REPORTING VIOLATIONS**

You must report any violation of this Code, Mohawk policy or legal requirement….

**FAIR AND HONEST DEALING**

You must deal fairly and honestly with Mohawk's employees, shareholders, customers, suppliers and competitors. You must behave in an ethical manner and not take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair business practice.

*** 

**COMPLIANCE WITH LAWS, RULES AND REGULATIONS**

Mohawk strives to ensure all activity on its behalf is in compliance with applicable laws, rules and regulations. You must comply with all applicable laws, rules and regulations, whether or not specifically addressed in this Code . . . ..

***

**Integrity of Records and Compliance with Accounting Principles**

Mohawk and the law require the preparation and maintenance of accurate and reliable business records. You must prepare all reports, books and records of Mohawk with care and honesty. Mohawk maintains a system of internal controls to ensure that transactions are carried out in accordance with management's authorization and properly recorded. This system includes policies, procedures and examination by a professional staff of internal auditors. Mohawk expects you to adhere to these policies and procedures.

37.    In addition, the Company has adopted Supplemental Standards for Senior Financial Officers, which is applicable to defendants Lorberbaum, Boykin, Wellborn, Landau, and states:

**INTEGRITY AND ACCURACY OF PUBLIC DISCLOSURES**

Mohawk's principal executive officer and senior financial officers must take all reasonable steps to ensure that the disclosures in the reports and documents that Mohawk files with or submits to the Securities and Exchange Commission and in other public communications are full, fair, accurate, timely and understandable. In the event that the principal executive officer or a senior financial officer learns that any such report, document or communication does not meet this standard and the deviation is material, then such officer will review and investigate the deviation, advise the Board of Directors or the appropriate Board committee and, where necessary, revise the relevant report, document or communication.

**ACCOUNTING TREATMENT**

Although a particular accounting treatment for one or more of Mohawk's operations may be permitted under applicable accounting standards, the principal executive officer and senior financial officers will not authorize or permit the use of such an accounting treatment if the effect is to distort or conceal Mohawk's true financial condition.

38.     Additionally, as Audit Committee members during the Relevant Period, defendants Onorato, Bruckmann, Ill, and Runge (the "Audit Committee Defendants") owed specific duties to Mohawk to oversee management's conduct of the financial reporting process, the system of internal, financial and administrative controls, and the annual independent audit of the Company's consolidated financial statements.

39.     Moreover, the Audit Committee Charter provides that the purpose of the Audit Committee is:

The Audit Committee (the "Committee") is appointed by the Board of Directors to assist the Board in fulfilling its oversight responsibilities. The Committee shall monitor (a) the integrity of the Company's publicly reported financial statements, (b) the Company's compliance with legal and regulatory requirements, (c) the independent auditors' qualifications and independence, and (d) the performance of the Company's internal audit function and independent auditors. In furtherance of this purpose, the Committee shall maintain direct communication among the Company's independent auditors and VP - Internal Audit and the Board of Directors. In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention with full access to all books, records, facilities and personnel of the Company.

40.     Pursuant to the Audit Committee Charter, the Audit Committee Defendants had the following additional responsibilities during the Relevant Period:

a.  Study and make recommendations to the Board of Directors with respect to audit policies and procedures and the scope and extent of audits. In consultation with corporate management, the independent auditors, and the internal auditors, consider the integrity of the Company's financial reporting processes and controls. Discuss significant financial and other risk exposures and the steps corporate management has taken to monitor, control, and report such exposures.

b.  Meet quarterly with corporate management and with the independent auditors, to discuss the annual audited financial statements, including footnotes, the unaudited quarterly financial results prior to the release of earnings and/or the quarterly financial statements prior to filing or distribution, including, in each case, a review of the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations". In discharging this obligation, receive and review, if necessary, a report from the controller as to any unusual deviations from prior practice that were included in the preparation of the annual or quarterly financial results. Review and discuss (1) draft press releases of unaudited interim and annual financial results before public release and (2) financial information and earnings guidance provided to analysts and ratings agencies. Press releases and interim financial statements also will be reviewed by the independent auditors prior to public release.

c.  Review the report to the Committee from the Company's independent auditors in accordance with Section 204 of the Sarbanes-Oxley Act of 2002. Review the contents of such report and all major accounting policy matters involved in the preparation of interim and annual financial reports with corporate management and any deviations from prior practice with the independent auditors.

d.  Review with the independent auditors, on completion of the annual audit, their experience, any difficulties encountered, any restrictions on their work, cooperation received, significant disagreements with corporate management, their findings and their recommendations. Discuss certain matters required to be communicated to audit committees in accordance with AICPA SAS 61.

e.  Review the application of significant regulatory, accounting and auditing policies, including new pronouncements, to the Company's financial reports.

f.  Analyze financial reports to understand performance fluctuations between reporting periods and between reports and plan.

g.  Review and assess the adequacy of internal accounting procedures and controls, including a review with the independent auditors of their evaluation of the Company's internal controls. Review quarterly the programs that the Company has instituted to correct any control deficiencies noted by the VP - Internal Audit in the periodic review or the independent auditors in their annual review. Discuss with management the results of the foregoing reviews, including significant items and potential ways to improve the accounting procedures and controls.

h.  Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

i.  Report annually to the Board of Directors, after the close of each fiscal year but prior to the Company's annual meeting of stockholders, as well as on any other occasion, any issues that arise with respect to the quality or integrity of the Company's publicly reported financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the independent auditors, the

performance of the internal audit function, or whatever it deems appropriate concerning the activities of the Committee.

41.     With regard to risk oversight, the proxy statement filed with the SEC on April 3, 2020 ("2020 Proxy") states:  "Management is responsible for the day-to-day management of the risk that we face, while the Board, as a whole and through its committees, has responsibility for the oversight of risk management.  In its risk oversight role, the Board is responsible for satisfying itself that the Company's risk management processes are adequate and functioning as designed."

## BACKGROUND

42.     During the past several years, the flooring industry has seen a rapid and significant shift in consumer demand for a new flooring material, LVT, as an alternative to Conventional Flooring Products.  LVT is predominantly manufactured in and exported from China, where manufacturers swiftly ramped up LVT production capacity and product innovation.

43.     While Mohawk's competitors entered distribution deals directly with Chinese manufacturers to capitalize on the growing LVT trend, Mohawk took a different approach by investing in LVT production plants and growing its LVT business through the acquisition of IVC.

44.     However, prior to and during the Relevant Period, Mohawk struggled to grow its LVT business and keep up with consumer demand for the product because

of its LVT "capacity restraints" and other production issues.  The popularity of LVT has been significant for Mohawk, because as consumer demand for LVT has grown, it drew growth away from Mohawk's Conventional Flooring Products, in which the Company has historically dominated the market.  Thus, as rapid growth in demand for LVT diminished sales of the Company's Conventional Flooring Products, Mohawk was left scrambling to recover so that its sales growth did not decline.

45.    To conceal this diminished sales growth, the Individual Defendants caused the Company to engage in a channel stuffing scheme with its Conventional Flooring Products to make Mohawk's sales growth and financial performance appear far better than they actually were.  In instances where a company provides excess supply to create a misleading impression about its sales or financial health, this practice is illegal and a form of improper revenue recognition.

46.    As a result of this scheme, during the Relevant Period, Mohawk reported record revenues, attributing its strong financial performance to a growing demand for certain Conventional Flooring Products, investments in new and differentiated products, and the "exceptional execution" of its businesses.  At the same time, to alleviate investor concerns regarding the Company's increasing accounts receivable and rising inventory levels, the Individual Defendants repeatedly

misled investors and the investing public by blaming the increases on external factors such as a changing mix in customers, higher raw material costs, and inflation.

## THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS

47.    On April 28, 2017, Mohawk issued a press release announcing its first quarter financial results.  That same day, Mohawk held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of 2017.  During the call, defendant Lorberbaum touted the "growing demand" for certain Mohawk Conventional Flooring Products and stated that the Company's investments in making "more differentiated products" and "innovative new products" were a driving factor in Mohawk's revenue growth.

48.    During the call, defendant Boykin told investors that the Company's DSO had increased to 54.9 days compared to 52.3 days the prior year, primarily as a result of "channel mix."  Defendant Boykin also reported increased inventories, with DII increasing to 110 days compared to 107 days the prior year, and attributed the increase to "geographic expansion and product growth."

49.    The statements set forth above in ¶¶ 47-48 were materially false and misleading.  In reality, the Individual Defendants engaged in deceptive and unsustainable business practices to mask declining customer demand for Mohawk's Conventional Flooring Products.   The Company's revenue growth was not

attributable to product differentiation and innovation or growing demand for Conventional Flooring Products, but rather due to unsustainable channel stuffing of Conventional Flooring Products. Mohawk's increasing accounts receivable was not the result of channel mix and its increasing inventories was not the result of product growth and expansion, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.

50.     On July 27, 2017, Mohawk issued a press release announcing its second quarter financial results. The next day, on July 28, 2017, Mohawk held a conference call with analysts and investors to discuss the Company's financial results for the second quarter of 2017. During the conference call, defendant Lorberbaum stated that "[Mohawk's] businesses continued their exceptional execution, with sales growth of 6%." Defendant Wellborn touted the "increased demand" for certain Mohawk Conventional Flooring Products, and defendant Lorberbaum stated that the Company was "fueling [its] growth around the globe with significant investments to extend [its] product portfolio and penetrate new markets." Defendant Wellborn also stated that the Company was "growing [its] sales with unique merchandising and promotions to optimize each channel" for certain Mohawk Conventional Flooring Products. During the call, defendant Boykin reported an increase in the Company's receivables and reported that DSO had increased to 55 days compared to 54 days the

prior year "due to the changing mix in our customers in the quarter."  In addition, defendant Boykin told investors that the Company's inventories had increased, with DII at 109 days compared to 105 days the previous year, and he attributed the increase to "raw material inflation and more sourced product needed to support [its] LVT, ceramic and countertop businesses."  In response to an analyst's question regarding the Company's significant growth in inventories, defendant Lorberbaum replied that the growth was the result of increasing material costs, the Company increasing the number of sourced products to support its new businesses, and a U.S. economy that was not as robust as expected.

51.    The statements set forth above in ¶ 50 were materially false and misleading.  In reality, the Individual Defendants engaged in deceptive and unsustainable business practices to mask declining customer demand for Mohawk's Conventional Flooring Products.  The Company's revenue growth was not attributable to exceptional execution, unique merchandising and promotions, or growing demand for Conventional Flooring Products, but rather due to unsustainable channel stuffing of Conventional Flooring Products.  Mohawk's increasing accounts receivable was not the result of a changing mix of customers and its increasing inventories was not the result of raw material inflation and more sourced product,

but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.

52.     On October 26, 2017, Mohawk issued a press release announcing its third quarter financial results.  The next day, on October 27, 2017, Mohawk held a conference call with analysts and investors to discuss the Company's financial results for the third quarter of 2017.  During the call, defendant Lorberbaum touted the "increasing demand" for certain Mohawk Conventional Flooring Products and that the Company's investments to "enhance[] [its] product offering with unique designs and differentiated features" and introduce "new product[s]" were a driving factor in Mohawk's sales growth.  During the call, defendant Boykin again reported increased inventory levels and again attributed the increase to "raw material inflation and source product growth."

53.     The statements set forth above in ¶ 52 were materially false and misleading.  In reality, the Individual Defendants engaged in deceptive and unsustainable business practices to mask declining customer demand for Mohawk's Conventional Flooring Products.  The Company's revenue growth was not attributable to product differentiation and innovation or growing demand for Conventional Flooring Products, but rather due to unsustainable channel stuffing of Conventional Flooring Products.  Mohawk's increasing inventories was not the

result of raw material inflation and source product growth, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.

54.     On February 8, 2018, Mohawk issued a press release announcing its fourth quarter financial results.  The next day, on February 9, 2018, Mohawk held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter of 2017.  During the call, defendant Wellborn touted the "increasing demand" for certain Mohawk Conventional Flooring Products, and defendant Lorberbaum stated that the Company's investments to add "new products" and to "differentiat[e] [its existing] products" were a driving factor in its sales growth.  In addition, defendant Wellborn stated that "[o]ur high-styled offerings, consumer brands, franchised and owned retail stores and efficient operations give us a significant competitive advantage" and that the Company was "operating at full capacity and [] expanding [its] production to satisfy the growing demand and increase [its] market share."  During the call, defendant Boykin reported that the Company's inventories had increased, with DII at 119, and he attributed the increase to "higher raw material cost, ramp-up of new products and backwards integration."  Similarly, in direct response to an analyst's question, defendant Lorberbaum attributed the rising inventory levels to an "increase in raw material prices before the

selling price have gotten through and continuing," as well as to some "backward integration" the Company has done.

55.   The statements set forth above in ¶ 54 were materially false and misleading.   In reality, the Individual Defendants engaged in deceptive and unsustainable business practices to mask declining customer demand for Mohawk's Conventional Flooring Products.   The Company's revenue growth was not attributable to product differentiation and innovation or growing demand for Conventional Flooring Products, but rather due to unsustainable channel stuffing of Conventional Flooring Products.   Mohawk's increasing inventories was not the result of increasing raw material prices and the Company's backward integration, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.   As a result of Mohawk's channel stuffing, the Company was not enjoying a "competitive advantage."

56.   On April 26, 2018, Mohawk issued a press release announcing its first quarter financial results.   The next day, on April 27, 2018, Mohawk held a conference call with analysts and investors to discuss the Company's financial results for the first quarter of 2018.   During the call, defendant Boykin stated that the Company's "[i]nventory turns continue to be impacted by increasing inflation and our backwards

integration."  During the call, defendant Lorberbaum also stated that the Company "anticipate[d] higher growth rates in all segments" throughout the rest of the year.

57.    The statements set forth above in ¶ 56 were materially false and misleading.  In reality, the Individual Defendants engaged in deceptive and unsustainable business practices to mask declining customer demand for its Conventional Flooring Products.   Mohawk's increasing inventories were not the result of increasing inflation or the Company's backward integration, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.  As a result of the Company's channel stuffing, the Individual Defendants knew that Mohawk's growth rate was unsustainable.

**THE TRUTH EMERGES**

58.    On July 25, 2018, after the market closed, the Company reported disappointing financial results for the second quarter of 2018, with earnings that were well below both Wall Street estimates and the Company's previous guidance range. These shortfalls were driven by Mohawk's efforts to "produce[] less [Conventional Flooring Products] than [it] sold to reduce inventory."  Similarly, Mohawk disclosed that it "reduced [its] production volumes more than [the Company] had thought" and acknowledged that the Company "came into the year with higher inventories than [it] wanted to have."  The Company's efforts to reduce inventories signaled that its

sales channels were stuffed with more product than it was able to sell through. These disclosures caused the Company's stock price to decline from $217.37 per share to $179.31 per share, or over 17%, on unusually high trading volume.

59.     Despite these disclosures, Mohawk continued to misrepresent the demand for its Conventional Flooring Products and sales growth, as well as the reasons for rising inventory levels. Specifically, during the second quarter 2018 earnings call, defendant Boykin blamed the Company's increasing inventory levels on "[i]nflation [that] negatively impacted the calculation."

60.     The statements set forth above in ¶ 59 were materially false and misleading. In truth, the Individual Defendants engaged in deceptive and unsustainable business practices to mask declining customer demand for its Conventional Flooring Products. Mohawk's increasing inventories were not the result of increasing inflation, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.

61.     Then, on October 25, 2018, after the market closed, the Company issued a press release announcing its third quarter financial results. The Company reported sales and earnings for the third quarter of 2018 that substantially missed analysts' estimates and fell well below the Company's previous guidance range, with sales growth in all segments falling below estimates. Mohawk attributed its poor financial

results, in part, to manufacturing reductions that were required to control inventory buildup.  In particular, on October 26, 2018, during the third quarter 2018 earnings call, defendant Wellborn stated that "[t]o improve our inventory turns, we are presently manufacturing fewer units than we are selling, which is negatively impacting our costs."  As a result of these disclosures, the Company's stock price plummeted nearly 24%, from $151.07 per share to $115.03 per share, on unusually high trading volume.

62.     However, the Company continued to misrepresent the demand for its Conventional Flooring Products and sales growth and the reasons for rising inventory levels.  In particular, on October 26, 2018, during the third quarter 2018 earnings call, defendant Boykin again blamed the Company's increasing inventory levels on "[i]nflation and backwards integration [that] negatively impacted the calculations."  In addition, in response to an analyst's question regarding the Company's rising inventories, defendant Lorberbaum misled investors to believe it was the result of raw material inflation by stating that "inventory turns get worse because the raw materials have increased."  During the call, Defendant Boykin assured investors that inventories would "go down in the fourth quarter" and the Company would "see improvement in [its] inventory turns" into the next year.

63.    Similarly, on April 25, 2019, Mohawk issued a press release to report the Company's earnings for the fiscal quarter.  On April 26, 2019, during the first quarter 2019 earnings call, defendant Landau attributed the Company's increasing inventory levels to "the ramp up of new plants, acquisitions and higher raw material costs."  In addition, in response to an analyst's question regarding the Company's rising inventories, defendant Lorberbaum stated that the Company's "inventories in the ongoing businesses were kept under control with lower production rates."

64.    The statements set forth above in ¶¶ 61-63 were materially false and misleading.  In reality, the Individual Defendants engaged in deceptive and unsustainable business practices to mask declining customer demand for its Conventional Flooring Products.  Mohawk's increasing inventories was not the result of higher raw materials costs or new plants and acquisitions, but instead the result of the Company deliberately stuffing the channels with Conventional Flooring Products to boost sales.  In reality, the Company's inventories were not "under control," but rather bloated with too much product as a result of Mohawk channel stuffing its distributors with Conventional Flooring Products, which caused the Company's customers to significantly reduce their orders for Conventional Flooring Products.

65.     Then, on July 25, 2019, after the market closed, Mohawk revealed that sales in its Flooring NA segment were down 7% year-over-year, and that it was again reducing production to control inventory levels and match its supply with customer demand.   The Company also revealed that increased competition and excess inventory had impacted its financial results, particularly in its Global Ceramic segment.  The Company announced that "lower demand" for certain Conventional Flooring Products created excess inventory which impacted the Company's sales and margins.   The Company also disclosed that there was a "big buildup in inventory in ceramic" in the sales channel, which had negatively impacted the Company's sales. Accordingly, the Company gave a weak earnings forecast for the third quarter of 2019, which was well below analysts' estimates.  As a result of these disclosures, the price of Mohawk's stock dropped from $156.36 per share to $128.84 per share, or nearly 18%, on unusually high trading volume.

## DAMAGES TO MOHAWK

66.     As a result of the Individual Defendants' improprieties, Mohawk engaged in the improper scheme described herein and disseminated improper public statements concerning Mohawk's operations, prospects, and internal controls.  This misconduct has devastated Mohawk's credibility.

67.    As a direct and proximate result of the Individual Defendants' actions, Mohawk has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.  In addition, the Company will incur costs associated with its goods that may be obsolete or damaged, and so cannot be resold, due to the Company inducing its suppliers to take its product even though not needed.

68.    In addition, the Individual Defendants decision to not invest in or partner with LVT producers in China has left the Company at a competitive disadvantage.

## DERIVATIVE AND DEMAND ALLEGATIONS

69.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

70.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

71.    Plaintiff is an owner of Mohawk common stock and was an owner of Mohawk common stock at all times relevant hereto.

72.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

73.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Mohawk Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

74.    At the time this action was commenced, the Board consisted of nine directors: defendants Balcaen, Bogart, Bruckmann, Ill, Lorberbaum, Onorato, Runge, and Wellborn, and non-party John Engquist.  Eight members of the Board are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO DEFENDANTS BALCAEN, BOGART, BRUCKMANN, ILL, LORBERBAUM, ONORATO, RUNGE, AND WELLBORN BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

75.    Defendants Balcaen, Bogart, Bruckmann, Ill, Lorberbaum, Onorato, Runge, and Wellborn (the "Director Defendants") all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors during the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

76.    Moreover, the Director Defendants, as directors owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company was acting legally and its internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously allowed the Company to engage in a channel-stuffing scheme and in connection therewith reviewed, authorized and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

77.    The Director Defendants knowingly and consciously allowed the Company to engage in a channel stuffing scheme, and knowingly and consciously allowed the authorization of false and misleading statements, failure to timely correct such statements, failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director  Defendants face a substantial likelihood of liability.  If the

Director Defendants were to bring a suit on behalf of Mohawk to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason demand is futile as to the Director Defendants.

### DEFENDANT LORBERBAUM IS NEITHER INDEPENDENT NOR DISINTERESTED AND DOMINATES AND CONTROLS THE COMPANY

78.    As Mohawk admits in its SEC filings, including the 2020 Proxy, defendant Lorberbaum, the Company's CEO and Chairman of the Board, is not an independent director.  Defendant Lorberbaum is not disinterested for purposes of demand futility because his principal occupation is CEO and Chairman.  For compensation in these positions he received $3,126,417, $4,631,485, and $5,017,713 for the years 2019, 2018, and 2017, respectively.  These amounts are material to defendant Lorberbaum.

79.    Demand is futile because the Board is dominated and controlled by defendant Lorberbaum because Mohawk is a family operated company.  Defendant Lorberbaum built Mohawk into the largest flooring company in the world and defendant Lorberbaum has a 26% stake in the Company, per the 2020 Proxy.[1]

---

[1]    According to the 2020 Proxy, defendant Lorberbaum owns 14.5% of the Company's outstanding common stock.  Aladdin Partners, L.P. ("Aladdin") owns 11.6% of the Company's outstanding common stock; ASL Management Corp. is a general partner of Aladdin Partners, L.P. and Defendant Lorberbaum is the owner of

80.     His father Alan Lorberbaum founded Aladdin in 1957 as a maker of bathmats and defendant Lorberbaum joined the company in 1976 and later became CEO.   In 1994, the Lorberbaum family sold Aladdin to Mohawk (the "Aladdin Merger") and defendant Lorberbaum took charge of Mohawk in 2001 and expanded into hard-surface flooring.   Defendant Lorberbaum's son, Brian Lorberbaum, is an employee in the Company and is likely being groomed for a leadership position at the Company.

81.     The 2020 Proxy further reflects the control the Lorberbaum family has over the Company.   For instance, the 2020 Proxy describes "Contractual Obligations with respect to the Election of Directors" explaining that in connection with the Aladdin Merger, the Company is allowed to nominate up to two persons to the Board and defendant Lorberbaum is one of those designees.

82.     Lastly, defendant Lorberbaum is also incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

---

100% of the outstanding voting stock of ASL Management Corp.

**DEMAND IS EXCUSED AS TO DEFENDANTS ONORATO, BRUCKMANN, ILL, AND RUNGE BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

83.    Defendants Onorato, Bruckmann, Ill, and Runge, as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements and allowed the Company to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy.   Instead, the Audit Committee Defendants, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls, and other financial information provided by the Company, as required by the Audit Committee Charter.  For this reason, demand is futile as to the Audit Committee Defendants.

**DEFENDANT WELLBORN IS NEITHER INDEPENDENT NOR DISINTERESTED**

84.    As Mohawk admits in its SEC filings, including the 2020 Proxy, defendant Wellborn, the Company's President and COO, is not an independent director.  Defendant Wellborn is not disinterested for purposes of demand futility because his principal occupation is President and COO. For compensation in these

positions, he received $2,700,848, $4,002,340, and $4,185,723, for the years 2019, 2018, and 2017, respectively.  These amounts are material to defendant Wellborn.

85.     Defendant Wellborn is also incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

### COUNT I
**Against The Individual Defendants For Breach Of Fiduciary Duty**

86.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.     The Individual Defendants owed and owe Mohawk fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Mohawk the highest obligation of good faith, fair dealing, loyalty, and due care.

88.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.

89.     The Individual Defendants had actual or constructive knowledge regarding the improper scheme alleged herein, and also knowingly made false and misleading statements regarding the Company's business operations, practices, and

internal controls in connection therewith, as alleged herein. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

90.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Mohawk has sustained significant and actual damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

91.     Plaintiff, on behalf of Mohawk, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of Mohawk and that Plaintiff is a proper and adequate representative of the Company;

B.     Against the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C.     Directing Mohawk to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation

and taking such other actions as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: May 18, 2020                          Respectfully submitted,

**WEISSLAW LLP**

Michael A. Rogovin, Esq.
Georgia Bar No. 780075
476 Hardendorf Avenue, NE
Atlanta, GA  30307
Tel:  (404) 692-7910
mrogovin@weisslawllp.com

*Liaison Counsel for Plaintiff*

**BRAGAR EAGEL & SQUIRE, P.C.**
Melissa A. Fortunato
Marion Passmore
101 California Street, Suite 2710
San Francisco, California 94111
Tel: (415) 365-7149

**HYNES KELLER & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, PA 19355
Telephone: (484) 875-3116

*Counsel for Plaintiff*