**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | | |
|---|---|---|
| IN RE MOHAWK INDUSTRIES, INC. | * <br> * <br> * | LEAD CASE NO.: <br> 4:20-CV-00110-ELR |
| DERIVATIVE LITIGATION | * <br> * <br> * | (Derivative Action) |
| This Document Relates To: | * <br> * | |
| 4:20-CV-00185-ELR | * <br> * | |

—————

**O R D E R**

—————

Presently before the Court is Proposed Intervenors Teamsters Local 456 Pension Fund, Teamsters Local 456 Annuity Fund, and Central Laborers Pension Fund's "Motion[s] to Intervene for Limited Purposes." [Docs. 34, 49].[1] By their instant motion, Proposed Intervenors (1) seek to intervene in this action; (2) move for a stay of proceedings until they complete their books and records investigations

---

[1] For clarity, the Court notes that Proposed Intervenors filed identical motions to intervene for limited purposes in both the <u>Palmer</u> derivative action (Civil Action No. 4:20-CV-00110) and <u>Tharayil</u> derivative action (Civil Action No. 4:20-CV-00185) before those actions were consolidated into the instant Consolidated Derivative Action (which bears the same case number as the <u>Palmer</u> derivative action, the earlier-filed case). [<u>See</u> Docs. 34, 49]. Plaintiffs Palmer and Tharayil (who are represented by the same counsel) submitted identical response briefs to the motions to intervene. [<u>See</u> Docs. 42, 51]. Subsequently, Proposed Intervenors filed the same reply brief in both actions. [<u>See</u> Docs. 46, 52]. Therefore, to obviate the need for citations to both sets of identical briefs, the Court cites to the Parties' briefs as filed in the <u>Palmer</u> derivative action throughout this order. [Docs. 34, 42, 46]. However, the rulings contained herein are intended to resolve both of Proposed Intervenors' "Motion[s] to Intervene for Limited Purposes," as noted in the conclusion of this order. [Docs. 34, 49].

pursuant to 8 Del. C. § 220 ("Section 220 investigation" or "books and records investigation") concerning Mohawk Industries, Inc. ("Mohawk" or "the Company"), the corporation at the center of this litigation; (3) oppose the consolidation of Civil Action No. 4:20-CV-00185 (the "Tharayil derivative action") with this case (the "Palmer derivative action"); and (4) oppose the appointment of Johnson Fistel, LLP and Brager Eagel & Squire, P.C. as lead counsel. [See id. at 2]. For the reasons set forth below, the Court grants in part and denies as moot in part Proposed Intervenors' motion.

## I.     Background

As Proposed Intervenors set forth in their motion, Mohawk is a global manufacturer of flooring products. [See Doc. 34-1 at 4]. Proposed Intervenors frame the alleged underlying facts of this case as follows.[2] No later than April 2017, Mohawk (a Delaware corporation) allegedly sought to begin production of a new flooring product known as Luxury Vinyl Tile (or "LVT"), which was gaining popularity in the marketplace because "LVT wears better than wood, stone, or ceramic tile and is easier and cheaper to install." [See id.] To that end, Mohawk purportedly opened a new LVT plant in Georgia and acquired an international

---

[2] In their motion, Proposed Intervenors proffer that their facts "were taken from the Consolidated Class Action Complaint for Violations of the Federal Securities Laws [Dkt. 37] in Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., Civ. A. No. 4:20-cv-0005-ELR (N.D. Ga. June 29, 2020)." [See Doc. 34-1 at 4 n.4].

company that manufactures LVT.  [See id.]  Despite these endeavors, Mohawk supposedly began having financial difficulties.  [See id.]

## A.    Mohawk's Purported Schemes

According to Proposed Intervenors, certain directors and executives of Mohawk attempted to conceal the Company's financial difficulties in various ways. [See id. at 5–9].  One such way was the alleged "Saturday Scheme," whereby Mohawk instructed its distribution center employees to "load their trucks with all items ordered by any customer at any time" on the last Saturday of each financial quarter, "even though the agreed-upon delivery dates were in future quarters."  [See id. at 5].  After the employees loaded the trucks with the future delivery orders, Mohawk would purportedly "auto-generate invoices for the customers' accounts and recognize a 'sale' in the current quarter, despite the products not having been delivered."  [See id.]  Thus, the Saturday Scheme allegedly allowed Mohawk to improperly record the orders sitting in its distribution center trucks as money "earned" toward its quarterly revenue targets (and other financial metrics).  [See id.]

Mohawk's leadership also supposedly attempted to conceal the Company's financial difficulties by overproducing LVT and other flooring products.  [See id. at 6].  Specifically, Proposed Intervenors claim that Mohawk's former president, Brian Carson, ordered the Company to produce "enormous quantities" of LVT at its domestic manufacturing centers, despite the fact that much of the LVT being made

was "unsalable" and "scrap." [See id.] Even though this damaged LVT would never reach customers, Carson allegedly caused Mohawk to record the defective product as "inventory" so as to inflate Mohawk's "margins and net income" and "to hide from investors the rampant quality-control problems plaguing the Company's attempts to compete in the burgeoning LVT market." [See id.] Further, Proposed Intervenors contend Carson caused Mohawk to drastically overproduce several other products, which "spread[] the Company's fixed manufacturing costs across more products" and thereby "artificially reduce[d] the Company's cost of sales, which in turn inflated the Company's margins."[3] [See id. at 5–6.]

Consequently, at some point during 2018, Mohawk's chief executive officer and chairman of the board, Jeffrey Lorberbaum, purportedly conducted an internal investigation that involved "everyone on Mohawk's Executive Leadership Team." [See id. at 7]. As a supposed result of the investigation, Lorberbaum terminated Carson for "cooking the books[.]" [See id.] However, Lorberbaum allegedly "continued to keep the specifics of Carson's schemes hidden from investors" and released a press statement that Carson had merely "resigned." [See id.] Proposed

---

[3] As Plaintiff Palmer alleged in his Complaint, this overproduction was supposedly part of a "channel stuffing scheme." See Compl. ¶ 8 [Doc. 1]. Plaintiff Palmer contends: "Channel stuffing is a business practice in which a company, or a sales force within a company, inflates its sales figures by forcing more products through a distribution channel than the channel is capable of selling." See id. Thus, according to Plaintiff Palmer, certain directors and executives of Mohawk "caused Mohawk to induce their distributors to take on surpluses of [products] that were vastly greater than demand, in an effort to make Mohawk's sales growth and financial performance appear far better than they were." See id.

4

Intervenors maintain that Carson, as part of his termination, was given an award (hereinafter, the "Carson Award") of a $1 million "all-cash payment" by Mohawk, in addition to vested stock benefits to "ensure [his] silence" and cooperation as a witness in any forthcoming litigation.   [See id. at 7–8].   Further, Proposed Intervenors allege that during this same timeframe, all of Mohawk's "top executives received (but did not earn) huge compensation awards for supposedly hitting 'performance-based' compensation metrics [('Performance-Based Executive Compensation')], which have not been clawed back [], even though the Company and the senior executives themselves knew that such metrics were only achieved through fraudulent schemes, including the Saturday Scheme."   [See id. at 8].

Subsequently, despite having terminated Carson in 2018, Lorberbaum purportedly allowed the Saturday Scheme, the issues with production and inventory, and the fraudulent financial reporting practices "to continue unabated into 2020[.]" [See id.]  Additionally, Proposed Intervenors claim that Mohawk executives "made numerous materially false and/or misleading statements or omissions" to the Company's stockholders over the course of several years "to misrepresent and conceal the truth" regarding the Company's financial situation.  [See id. at 8–9].

## B.    Stockholder Litigation and Investigations

As a result of these alleged actions, on January 3, 2020, the Public Employees' Retirement System of Mississippi filed a class action suit on behalf of its members

against Mohawk and certain Mohawk directors/executives (the "Related Securities Class Action"). <u>See</u> Civil Action No. 4:20-CV-00005 [Doc. 1]. In the Related Securities Class Action, Public Employees' Retirement System of Mississippi claims it was damaged by purchasing Mohawk stock at an artificially inflated price due to misleading representations by Mohawk and its directors/executives. [<u>See generally</u> <u>id.</u>] Further compounding Mohawk's exposure to potential liability, on July 13, 2020, Mohawk "announced that it received subpoenas issued by the U.S. Attorney's Office for the Northern District of Georgia and the SEC on June 25, 2020 based on topics similar to those raised by" the complaint in the Related Securities Class Action. [<u>See</u> Doc. 34-1 at 9–10].

Importantly, after the Related Securities Class Action was filed, two (2) individual stockholders of Mohawk filed derivative actions on behalf of the Company during 2020. [<u>Id.</u>] Specifically, Plaintiff Tom Palmer filed a Complaint on May 18, 2020, asserting claims on behalf of Mohawk for breach of fiduciary duty against certain directors/executives of Mohawk in connection to the "channel stuffing scheme" and related misstatements. <u>See</u> Compl. On August 6, 2020, Plaintiff Joe Tharayil initiated a second derivative action on behalf of Mohawk, bringing similar claims for breach of fiduciary duty and breach of duty of loyalty against certain Mohawk directors/executives stemming from (among other things) the purported "channel stuffing scheme," related misstatements, and for allegedly

causing Mohawk to repurchase more than $443 million worth of its own shares at artificially inflated prices. See Civil Action No. 4:20-CV-00185 [Doc. 1] (hereinafter, the "Tharayil Complaint"). Additionally, the Tharayil Complaint asserts claims for unjust enrichment and waste of corporate assets (for repurchasing Mohawk shares at artificially inflated prices, paying the Carson Award, and other awards and benefits paid to directors). See id.

### C.    Section 220 Books and Records Investigation

However, according to Proposed Intervenors, both Mr. Palmer and Mr. Tharayil (together, "Plaintiffs") failed to avail "themselves of the 'tools at hand' authorized under Delaware law"—specifically, a Section 220 books and records investigations as authorized by 8 Del. C. § 220—to obtain important information prior to filing their derivative actions. [See Doc. 34-1 at 2]. Proposed Intervenors contend Plaintiffs should have conducted a Section 220 investigation before initiating suit on behalf of the Company to "bolster any argument that pre-suit demand would have been futile, and thus excused as a matter of law."[4] [See id.] As Proposed Intervenors acknowledge, conducting a Section 220 investigation is not

---

[4] "Demand futility" is a term used to explain the excusal of the "demand requirement" contained in the heightened pleading standards for shareholder derivative actions as set forth in Federal Rule of Civil Procedure 23.1(b) and Delaware Chancery Court Rule 23.1(a). Pursuant to Delaware law, the demand requirement may be excused where it would be "futile" because "the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation." See Wood v. Baum, 953 A.2d 136, 140 (Del. 2008). If a derivative plaintiff fails to meet the demand pleading requirement and *also* fails to show that such a demand would have been futile, his complaint may be subject to dismissal. See id.

legally required to prove demand futility in a derivative shareholder action, although it is a statutory right conveyed to stockholders pursuant to Delaware law to obtain a Delaware corporation's internal records.  [See id. at 2, 10–13] (citing 8 Del. C. § 220).  Yet, Plaintiffs allege that a pre-suit demand on Mohawk's board of directors would have been futile, as Plaintiffs believe is clear from their review and analysis of various publicly available information (including SEC filings made by Mohawk, the pleadings of the Related Securities Class Action, press releases, news reports, analyst and industry reports, and investor conference call transcripts).  See Compl. at 2, ¶ 73; see also Tharayil Compl. at 2, ¶ 192.

Proposed Intervenors disagree and contend that Plaintiffs' failure to undertake a Section 220 investigation rendered Plaintiffs' "pre-suit investigations . . . deficient" and places their claims on behalf of Mohawk at unnecessary hazard of dismissal, which "risks prejudice to the Company and other Mohawk stockholders." [See id. at 2].  Indeed, as Mohawk stockholders themselves, Proposed Intervenors initiated their own Section 220 investigations of Mohawk's books and records on July 31, 2020, and August 6, 2020.  [See id. at 12]; [see also Docs. 34-2, 34-3] (copies of Section 220 demand letters).  In particular, Proposed Intervenors requested several categories of documents related to (among other things) "the Saturday Scheme, the Carson Award, the Performance-Based Executive Compensation, Carson's 'resignation,' and the inventory issues discussed above." [See Doc. 34-1 at 13].

Subsequently, Proposed Intervenors filed their instant motion to intervene on September 4, 2020.  [Doc. 34].  Shortly thereafter, by an Order dated October 21, 2020, the Court consolidated Palmer and Tharayil derivative actions into this single Consolidated Derivative Action and appointed Lead Counsel for Plaintiffs.[5] [Doc. 47].  By the same Order, the Court ruled that this Consolidated Derivative Action would remain stayed pursuant to the same terms "set forth in Judge Cohen's order in Palmer v. Lorberbaum, et al., No. 4:20-CV-00110 entered on July 20, 2020. [See Doc. 28]."  [Doc. 47 ¶ 11].

With this factual and procedural background in mind, the Court now proceeds to Proposed Intervenors' instant motion.  Before assessing the merits of the Parties' arguments, the Court sets forth the relevant legal standard.

## II.    Legal Standard

Proposed Intervenors assert that they are entitled to intervention as a matter of right pursuant to Rule 24(a)(2) of the Federal Rules of Civil Procedure or, in the alternative, permissive intervention pursuant to Rule 24(b)(1).  Rule 24(a) provides for intervention as a matter of right as follows:

On timely motion, the court must permit anyone to intervene who: (1) is given an unconditional right to intervene by a federal statute; or (2)

---

[5] The October 21, 2020 Order provides: "[t]he cases Tharayil v. Lorberbaum, et al., No. 4:20-CV-00185-ELR and Palmer v. Lorberbaum, et al., No. 4:20-CV-00110-ELR (the 'Related Derivative Actions') are hereby deemed related and consolidated for all purposes, including pre-trial proceedings and trial, into one consolidated action (the 'Consolidated Derivative Action')." [Doc. 47 ¶ 1].  By the same Order, the Court appointed Johnson Fistel, LLP and Brager Eagel & Squire, P.C. as lead counsel for Plaintiffs in the Consolidated Derivative Action.  [Id. ¶ 4].

> claims an interest relating to the property or transaction that is the
> subject of the action, and is so situated that disposing of the action may
> as a practical matter impair or impede the movant's ability to protect its
> interest, unless existing parties adequately represent that interest.

See FED. R. CIV. P. 24(a).   Alternatively, Rule 24(b) provides for permissive

intervention under the following circumstances:

> On timely motion, the court may permit anyone to intervene who: (A)
> is given a conditional right to intervene by a federal statute; or (B) has
> a claim or defense that shares with the main action a common question
> of law or fact.

See FED. R. CIV. P. 24(b)(1).

Further, a "court has broad discretion to permit intervention" pursuant to Rule

24(b)(1)(B).   See Tansey v. Rogers, CV121049RGACONSL, 2016 WL 3519887, at

*2 (D. Del. June 27, 2016) (citing United States v. Territory of Virgin Islands, 748

F.3d 514, 524 (3d Cir. 2014)).[6]   "In exercising its discretion, the court must consider

whether the intervention will unduly delay or prejudice the adjudication of the

original parties' rights."   See FED. R. CIV. P. 24(b)(3).   Finally, Rule 24(c) requires

that a motion to intervene "must state the grounds for intervention and be

---

[6] Because Mohawk is a Delaware corporation, it is undisputed that the Court should apply
substantive Delaware law (and Eleventh Circuit authority applying Delaware law).   See, e.g.,
Stepak v. Addison, 20 F.3d 398, 402 (11th Cir. 1994) (derivative shareholder plaintiffs bringing
an action on behalf of a Delaware corporation must satisfy the heightened pleading requirements
of both Federal Rule of Civil Procedure 23.1 and Delaware Chancery Court Rule 23.1); Peller v.
S. Co., 911 F.2d 1532, 1536 (11th Cir. 1990) (upholding the district court's application of
Delaware law to substantive issues related to a Delaware corporation in a derivative shareholder
action) (citing Burks v. Lasker, 441 U.S. 471, 478 (1979)); In re The Home Depot, Inc. Shareholder
Derivative Litig., 223 F. Supp. 3d 1317, 1323–24 (N.D. Ga. 2016) (applying Delaware's
substantive law because the defendant company was incorporated in Delaware).

accompanied by a pleading that sets out the claim or defense for which intervention is sought." See FED. R. CIV. P. 24(c).

## III.   Discussion

Having set forth the relevant legal standard, the Court proceeds to its analysis of Proposed Intervenors' motion and Plaintiffs' opposition thereto.

### A.   Motion to Intervene

Before the Court can determine whether Proposed Intervenors may intervene in the instant action pursuant to Rule 24, the Court must consider Plaintiffs' preliminary arguments regarding two (2) purported deficiencies of Proposed Intervenors' motion.  [See Doc. 42 at 7].  First, Plaintiffs assert that "Proposed Intervenors have failed [to comply with the] technical requirement" of Rule 24(c) that a motion to intervene "be accompanied by a pleading that sets out the claim or defense for which intervention is sought."  [See id.] (citing FED. R. CIV. P. 24(c)). Second, Plaintiffs contend that Proposed Intervenors' motion is untimely.  [See id.] The Court addresses these threshold matters in turn before turning to the substance of Proposed Intervenors' motion.

### 1.   Lack of accompanying pleading

As Plaintiffs observe and Proposed Intervenors concede, no proposed pleading accompanies the instant motion to intervene, as typically required by Rule 24(c).  [See Docs. 34-1 at 15 n.13; 42 at 3, 7]; see also FED. R. CIV. P. 24(c) (a motion

to intervene "must state the grounds for intervention and be accompanied by a pleading that sets out the claim or defense for which intervention is sought"). Plaintiffs proffer that "[s]tanding alone, this [c]ould be sufficient grounds to deny the motion." [See Doc. 42 at 7 n.4]  However, the case to which Plaintiffs cite for this proposition did not deny a motion to intervene for lack of an attached pleading. See Developers Sur. and Indem. Co. v. Archer W. Contractors, LLC, 616CV1875ORL40KRS, 2017 WL 8340660, at *2 (M.D. Fla. Apr. 3, 2017), report and recommendation adopted, 616CV1875ORL40KRS, 2017 WL 2274922 (M.D. Fla. May 25, 2017) (denying a motion to intervene where the proposed intervenor sought to litigate an issue not already in dispute which would necessarily expand the scope of litigation).

Likewise, the Court finds Plaintiffs' attempt to distinguish the instant circumstances from those in Piambino v. Bailey to be unpersuasive.  [See Doc. 42 at 7 n.4] (citing 757 F.2d 1112, 1121–22 (11th Cir. 1985)).  In Piambino, the Eleventh Circuit declined to require a separate pleading of a proposed intervenor pursuant to Rule 24(c) because an "additional" pleading would "merely replicate" material already on the record.  [See id.] (citing 757 F.2d at 1121–22).  Further, the Eleventh Circuit explained in Piambino that the proposed intervenor's "failure to annex a complaint to his motion to intervene could not possibly have prejudiced" the existing parties because they all "knew the nature of [proposed intervenor's]

substantive claims for relief; they were the very claims [l]ead [c]ounsel had asserted in [the original] complaint."[7]  See 757 F.2d at 1121.  Similarly, Proposed Intervenors here seek to advance the same claims brought by Plaintiffs on behalf of Mohawk related to Defendants' alleged participation in the Saturday Scheme, Carson Award, improper Performance-Based Executive Compensation, and Mohawk's inventory issues (which Plaintiffs call the "channel stuffing scheme").  [See Doc. 34-1 at 12–13].  Moreover, the Delaware Court of Chancery has held that a motion to intervene meets the "objectives of Rule 24(c)" where it is clear the proposed intervenors "share the same focus as the [l]ead [p]laintiffs[]" even absent an accompanying pleading.  See In re Freeport-McMoRan Copper & Gold Inc. Derivative Litig., CIV.A. 8145-VCN, 2013 WL 616296, at *2 n.13 (Del. Ch. Feb. 14, 2013).  This is particularly true where the proposed intervenors seek to inspect the subject corporation's books and records, as Proposed Intervenors seek to do in the matter at bar.  See id. at *2.

Accordingly, in line with the above authority, the Court will not deny Proposed Intervenors' motion for lack of strict compliance with Rule 24(c).  See Piambino, 757 F.2d at 1121.

---

[7] Additionally, in Piambino, the Eleventh Circuit explained that while "[s]ome courts of appeals have denied intervention to movants who have failed strictly to heed the requirements of Rule 24(c) . . . the majority of circuits, including this circuit, has not, choosing instead to disregard nonprejudicial technical defects."  See 757 F.2d at 1121.  Accordingly, this Court will not deny Proposed Intervenors' instant motion due to their lack of annexed complaint.

2.   <u>Timeliness</u>

Next, Plaintiffs argue that Proposed Intervenors fail to meet Rule 24's requirement that a motion to intervene must be timely.  [<u>See</u> Doc. 42 at 8–9]; <u>see also</u> FED. R. CIV. P. 24(a)–(b).  Specifically, Rule 24(b)(3) instructs that "[i]n exercising its discretion" upon consideration of a motion to intervene, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  <u>See</u> FED. R. CIV. P. 24(b)(3).  While "Rule 24 does not set forth actual time limits[,]" the Court possesses "relatively broad discretion in assessing timeliness[.]"  <u>See</u> <u>Fed. Trade Commn. v. MOBE Ltd.</u>, 618CV862ORL37DCI, 2019 WL 7842055, at *5 (M.D. Fla. Oct. 23, 2019), <u>report and recommendation adopted</u>, 618CV862ORL37DCI, 2019 WL 6907696 (M.D. Fla. Dec. 19, 2019), <u>appeal dismissed</u>, 20-10191-HH, 2020 WL 8260393 (11th Cir. Dec. 10, 2020).  Generally, courts in the Eleventh Circuit look to four (4) factors when considering whether a motion to intervene is timely:

> 1) the length of time during which the intervenor knew, or reasonably should have known, of his interest in the case before he petitioned for leave to intervene; 2) the extent of prejudice to existing parties as a result of the intervenor's failure to apply as soon as he knew or reasonably should have known of his interest; 3) the extent of prejudice to the intervenor if the petition is denied; and 4) the existence of unusual circumstances militating either for or against a determination that the application is untimely.

<u>See</u> <u>id.</u> (citing <u>United States v. Jefferson Cnty.</u>, 720 F.2d 1511, 1516 (11th Cir. 1983).  No single factor is dispositive in determining timeliness.  <u>See</u> <u>id.</u>

14

In the instant matter, Proposed Intervenors submitted their motion less than four (4) months after Plaintiff Palmer filed his Complaint.  See Compl.; [see also Doc. 34].  The Parties do not appear to dispute that this length of time is reasonable, nor do they argue that any unusual circumstances exist here.  [See generally Docs. 34-1, 42, 46].

Additionally, the Court does not find that any prejudice will result to the existing Parties by granting Proposed Intervenors' instant motion.  Indeed, other than the consolidation of the Palmer and Tharayil derivative actions into this Consolidated Derivative Action (and the appointment of Lead Counsel for Plaintiffs), no substantive proceedings have taken place yet.

Moreover, this matter is currently under a stay of proceedings pursuant to the July 20, 2020 Order entered by Judge Mark H. Cohen of this district.  [See Doc. 28]. Specifically, the July 20, 2020 Order provides that the stay shall remain in place "pending the earlier of (i) any of the defendants in the Related Securities Class Action filing an answer to the operative complaint, or (ii) the deadline for appealing a dismissal of the Related Securities Class Action with prejudice[.]"  [See id. at 2]. None of the defendants in the Related Securities Class Action have filed an answer to the operative complaint therein, nor has this Court issued its ruling on the pending motion to dismiss in the Related Securities Class Action.  See Pub. Emps.' Ret. Sys. of Miss., 4:20-cv-00005-ELR [Doc. 54].  Thus, neither of the conditions which could

trigger a lift of the stay in the matter at bar have come to pass.  [See Doc. 28 at 2].

Accordingly, the Court finds Proposed Intervenors' motion is timely.  [Doc. 34].

3.     Permissive Intervention

Having resolved the above preliminary matters, the Court now turns to the

substance of Proposed Intervenors' motion.  [Id.]  For the reasons explained below,

the Court finds that Proposed Intervenors meet the standard for permissive

intervention pursuant to Federal Rule of Civil Procedure 24(b)(1)(B).[8]   As this

district has observed:

> Rule 24(b)[(1)(B)] provides for permissive intervention when an
> applicant's claim or defense and the main action have a question of law
> or fact in common.   The determination of whether permissive
> intervention is proper in a case is a two-step process.  E.g., Meek v.
> Metro. Dade Cnty., Fla., 985 F.2d 1471, 1478 (11th Cir.1993),
> abrogated on other grounds by Dillard v. Chilton Cnty. Comm'n, 495
> F.3d 1324 (11th Cir. 2007).  The court must first determine whether the
> applicant's claim or defense and the main action share common
> questions of law or fact.  Id.  If this requirement is fulfilled the court
> must exercise its discretion in determining whether intervention should
> be allowed.  Id. (citing Stallworth v. Monsanto Company, 558 F.2d 257
> (5th Cir.1977)).   "Rule 24(b) [(1)(B)] plainly dispenses with any
> requirement that the intervenor shall have a direct personal or pecuniary
> interest in the subject of the litigation."  Id. (quoting SEC v. United
> States Realty and Improvement Co., 310 U.S. 434, 459 [] (1939)).
> Thus[,] the claim or defense clause of Rule 24(b)[(1)(B)] is generally

---

[8] For this reason, the Court need not determine whether Proposed Intervenors are entitled to
intervene as a matter of right pursuant to the more stringent standard of Rule 24(a).  See Georgia
Aquarium, Inc. v. Pritzker, 309 F.R.D. 680, 690 (N.D. Ga. 2014) (declining to determine whether
intervention was warranted as a matter of right where movants met the standard for permissive
intervention); In re Freeport-McMoRan Copper & Gold Inc. Derivative Litig., 2013 WL 616296,
at *2 (holding the same in a Delaware derivative shareholder action where lead plaintiffs and
proposed intervenors disagreed over whether to undertake a books and records investigation before
pursuing derivative claims).

given a liberal construction.  Id. (citing Stallworth[], 558 F.2d 257); In re Estelle, 516 F.2d 480, 485 (5th Cir. 1975).   "However, the intervening party must demonstrate more than a general interest in the subject matter of the litigation before permissive intervention is allowed."  In re Estelle, 516 F.2d at 485 (citing Alexander v. Hall, 64 F.R.D. 152 (D.S.C. 1974)).

See Georgia Aquarium, 309 F.R.D. at 690.

Additionally, pursuant to the Delaware Court of Chancery Rules, the Court must "consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties."  In re Freeport-McMoRan Copper & Gold Inc. Derivative Litig., 2013 WL 616296, at *2 (citing Del. Ct. Ch. R. 23(b)). Finally, the Court's decision to permit or deny intervention pursuant to Federal Rule of Civil Procedure 24(b)(1)(B) will not be disturbed absent clear abuse of discretion. See Purcell v. Bankatlantic Fin. Corp., 85 F.3d 1508, 1513 (11th Cir. 1996); Meek, 985 F.2d at 1477 (11th Cir. 1993); U.S. v. Dallas Cnty. Commn., Dallas Cnty., Ala., 850 F.2d 1433, 1443 (11th Cir. 1988).

By their instant motion, Proposed Intervenors assert they possess an interest in this Consolidated Derivative Action because they seek to "bolster the demand futility allegations" on behalf of Plaintiffs by completing their "books and records investigation authorized by Section 220 of the Delaware General Corporation Law[.]"  [Docs. 34-1 at 3; 46 at 14].  Specifically, Proposed Intervenors initiated their Section 220 investigations of Mohawk's books and records on July 31, 2020, and August 6, 2020.  [See id. at 12].  Proposed Intervenors requested from Mohawk

17

several categories of documents related to "the Saturday Scheme, the Carson Award, the Performance-Based Executive Compensation, Carson's 'resignation,' and the inventory issues" (which Plaintiffs refer to as the "channel stuffing" scheme). [See id. at 13]. By their instant motion, Proposed Intervenors contend that the completion of their Section 220 investigations is particularly needed because Plaintiffs did not "avail[] themselves of the tools at hand authorized under Delaware law[,]" and thus, "their pre-suit investigations were deficient, and proceeding on Defendants' [potential] [m]otions to [d]ismiss . . . risks prejudice to the Company and other Mohawk stockholders." [See id. at 2].

The Court acknowledges that both the Delaware Supreme Court and the Delaware Court of Chancery "have continually advised plaintiffs who seek to plead facts establishing demand futility" to "use[] a Section 220 books and records inspection to uncover such facts." See Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart, 845 A.2d 1040, 1056 (Del. 2004). While this consideration is not outcome-determinative pursuant to the standard for permissive intervention, the Court finds it persuasive that the Delaware Court of Chancery has granted motions to intervene in similar circumstances. E.g., In re Freeport-McMoRan Copper & Gold Inc. Derivative Litig., 2013 WL 616296, at *2 ("The [p]roposed [i]ntervenors believe that a books and records effort should be pursued,

and the Court, at least at this point, is not inclined, even if it could, to put a stop to that effort.").

Moreover, based on the proffered purposes of Proposed Intervenors' ongoing Section 220 investigations, the information that Proposed Intervenors seek all concerns the same alleged wrongdoing by Mohawk directors and executives underlying Plaintiffs' current claims for breach of fiduciary duty, breach of duty of loyalty, waste, and unjust enrichment.  [Compare Doc. 34-1 at 12–13], with Compl., and Civil Action No. 4:20-CV-00185 [Doc. 1].  Thus, Proposed Intervenors' "efforts would share multiple questions of law and fact in common with those of this action." See In re Freeport-McMoRan Copper & Gold Inc. Derivative Litig., 2013 WL 616296, at *2.  Accordingly, the Court finds Proposed Intervenors meet the standard for permissive intervention pursuant to Rule 24(b)(1)(B) because they possess a claim or defense that shares a common question of law or fact with the claims or defenses of Plaintiffs.  See FED. R. CIV. P. 24(b)(1)(B).

Further, the Court finds that granting Proposed Intervenors' motion will not "unduly delay or prejudice the adjudication of the rights of the original parties." See In re Freeport-McMoRan Copper & Gold Inc. Derivative Litig., 2013 WL 616296, at *2; see also Del. Ct. Ch. R. 23(b).  As noted above, this Consolidated Derivative Action is already stayed pursuant to the July 20, 2020 Order by Judge Mark H. Cohen, and neither condition which might trigger the end of the stay has come to

pass.  [See Docs. 28, 47].  Therefore, "[t]he books and records initiative will not interfere with the scheduling for this action, and, thus, allowing [] Proposed Intervenors to intervene will carry no adverse consequences for the existing parties[.]"  See In re Freeport-McMoRan Copper & Gold Inc. Derivative Litig., 2013 WL 616296, at *2.

Accordingly, in its discretion, the Court grants Proposed Intervenors' request to intervene in the instant Consolidated Derivative Action pursuant to Federal Rule of Civil Procedure 24(b)(1)(B).  [Doc. 34].

### 4.    Proposed Intervenors' Remaining Requests

Having granted Proposed Intervenors' request to intervene, the Court assesses the other requests presented by their instant motion.  Specifically, Proposed Intervenors (1) oppose the consolidation of the Palmer and Tharayil derivative actions and the appointment of lead counsel; and (2) request a stay of proceedings. [See Doc. 34-1 at 4, 24].  At this time, both requests are moot.

On October 21, 2020, this Court granted Plaintiffs' "Motion to Consolidate Cases and Motion to Appoint Lead Counsel" [Doc. 31] and Ordered the Palmer and Tharayil derivative actions to be combined into the present Consolidated Derivative Action.  [Doc. 47 at 3].  By the same Order, the Court granted Plaintiffs' request to appoint as Lead Counsel Johnson Fistel, LLP and Brager Eagel & Squire, P.C.  [Id. at 4].  Thus, to the extent Proposed Intervenors' motion opposes the consolidation

of the Palmer and Tharayil derivative actions and opposes the appointment of Lead Counsel, the Court denies these requests as moot.  [Doc. 34].  Regarding Proposed Intervenors' request for a stay, by its October 21, 2020 Order, the Court ruled that this Consolidated Derivative Action would remain stayed pursuant to the terms of the earlier Order [Doc. 28] entered by Judge Mark H. Cohen.  [Doc. 47 at 6].  Thus, Proposed Intervenors' request for a stay of proceedings is also due to be denied as moot.[9]  [Doc. 34].

## IV.    Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES AS MOOT IN PART** Proposed Intervenors' "Motion[s] to Intervene for Limited Purposes."  [Docs. 34, 49].  Specifically, the Court **GRANTS** Proposed Intervenors' request to intervene in this Consolidated Derivative Action.  [Docs. 34, 49].

However, the Court **DENIES AS MOOT** Proposed Intervenors' motions to the extent that they oppose the consolidation of Civil Action No. 4:20-CV-00185 (the "Tharayil derivative action") with Civil Action No. 4:20-CV-00185 (the "Palmer derivative action") and appointment of Johnson Fistel, LLP and Brager

---

[9] As set forth above, the current stay of proceedings pursuant to Judge Cohen's Order provides that this Consolidated Derivative Action shall remain stayed only through the earlier of two (2) occurrences: the filing of an answer by defendants in the Related Securities Class Action to the operative complaint in that case, or the deadline for appealing a potential dismissal with prejudice of the Related Securities Class Action.  [See Doc. 28 at 2].  After either such occurrence, the current stay provides that the Parties to this Consolidated Derivative Action shall meet and confer within thirty (30) days and submit to the undersigned either an update regarding case scheduling or a proposed scheduling stipulation for review.  [See id.]

Eagel & Squire, P.C. as Lead Counsel for this Consolidated Derivative Action. [See Docs. 34, 47, 49]. Finally, the Court **DENIES AS MOOT** Proposed Intervenors' request for a stay of proceedings. [Docs. 34, 49].

      **SO ORDERED**, this 28th day of September, 2021.

Eleanor L. Ross
United States District Judge
Northern District of Georgia